**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-CR-305-RDM** |
| **JOSEPH FISHER** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Joseph Fisher to 46 months incarceration, three years of supervised release, $2,000 in restitution, and a mandatory $305 special assessment. A 46-month sentence would reflect the high end of the government's calculated guidelines range[1] of 37 to 46 months.

**I.      INTRODUCTION**

The defendant, Joseph Fisher, a retired officer of the Boston Police Department, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police

---

[1] The draft PSR determined a total offense level of 17 and a guidelines range of 24 to 30 months. *See* Draft PSR at ¶ 94. As explained herein, the Government disagrees with that calculation. As of the date of this filing, the Government has not received the final PSR.

1

officers, and resulted in more than 2.9 million dollars in losses.[2]

Fisher was present at the early stages of breach of the Senate Wing Door of the Capitol Building. Upon entering the Capitol Building, Fisher made his way to the Capitol Visitor Center's Orientation Lobby. At that time, another rioter sprayed a chemical irritant at a Capitol Police officer. The officer chased the rioter through a hallway in an attempt to apprehend him. Fisher grabbed a chair, watched and waited as the rioter and officer approached his position, and rammed the chair into the officer. Fisher then grabbed the officer and pushed him as another rioter shoved the officer from behind. The fight ended with Fisher on the ground and the other rioter successfully escaped.

The government recommends that the Court sentence Fisher to 46 months of incarceration for his conviction of violating 18 U.S.C. 111(a).

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the court to the Complaint filed in this case, ECF 1, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

---

[2] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

**B.      Joseph Fisher's Role in the January 6, 2021 Attack on the Capitol**

In the morning of January 6, 2021, Fisher attended then-President Trump's rally on the National Mall in Washington, D.C. **(Image 1).**



*Image 1*

The first breach of the Capitol Building occurred at approximately 2:13 p.m. at the Senate Wing Door. Fisher was present at the early stages of the Senate Wing Door breach but did not enter the Capitol Building immediately because he paused to smoke a cigarette. **(Image 2; Video Exhibit 1 at 0:09).** Fisher also stood at an exterior window of the Capitol Building and assisted a rioter who appeared to be clearing tear gas from his face. At the same time, other rioters were breaking the windows and climbing through them into the Capitol Building while the emergency exit alarm was blaring. (**Video Exhibit 2 at 0:01**).



*Image 2*

At 2:24 p.m., approximately eleven minutes after the initial breach of the Capitol Building, Fisher entered the U.S. Capitol through the Senate Wing Door on the Northwest side of the Capitol Building. **(Images 3 and 4).**



*Image 3*



*Image 4*

From the Senate Wing Door, Fisher walked to the Crypt, entering at approximately 2:26 p.m. Fisher appeared to take out his phone and take photos or videos. **(Image 5).** Surrounding Fisher were rioters repeatedly chanting, "Stop the Steal." (**Video Exhibit 3 at 0:06**).

5



*Image 5*

From the Crypt, Fisher entered the East Crypt Lobby at approximately 2:29 p.m. **(Image 6).** United States Capitol Police (USCP) officers attempted to lock down the area and prevent rioters from entering the East Crypt Lobby. In the seconds before Fisher arrived there, rioters used trash cans and chairs to block mechanical doors from closing. Rioters then threw chairs, trash cans, and flag poles at the officers and deployed OC spray against the USCP officers. **(Video Exhibit 4 at 0:40)**. Rioters breached the door depicted in the still frame image. In the same area, a rioter can be heard screaming at a retreating USCP officer, "You're scared now motherfucker." **(Video Exhibit 5 at 0:12).**



*Image 6*

From the East Crypt Lobby, Fisher entered the Upper Orientation Lobby of the Capitol

Visitor's Center at approximately 2:35 p.m. **(Images 7, 8).**



*Image 7*



*Image 8*

Fisher entered the House side of the Capitol Visitor Center's Orientation Lobby at approximately 2:37 p.m. At approximately 2:38 p.m., Fisher approached the cement pillars on the right side. At around this time, a physical altercation began between rioters and USCP officers. Another rioter sprayed a chemical irritant (such as pepper spray or mace) at the officers.   One of the officers ("Officer J.G."), wearing a bright yellow vest, began to pursue the rioter down the right side of the hallway. At approximately 2:39 p.m., Fisher grabbed a chair, assumed a position behind the pillar, and waited as the rioter and Officer J.G. approached his position. Fisher chose his timing carefully and, just as Officer J.G. and the other rioter ran by, Fisher rammed the chair into Officer J.G. **(Image 9, Video Exhibit 6 at 0:20).** Fisher's intervention was successful and prevented Officer J.G. from apprehending the rioter.



*Image 9: Still shot from Video Exhibit 6 at 0:25*

Fisher continued to assault Officer J.G. by grabbing and pushing him as another rioter hit and shoved Officer J.G. from behind. **(Image 10).** The assault ended with Fisher on the ground.



*Image 10: Still shot from Video Exhibit 6 at 0:35*

At approximately 2:42 p.m., Fisher exited the U.S. Capitol via the Senate Wing Door. **(Image 11).**



*Image 11*

## III.   THE CHARGES

On September 6, 2023, a federal grand jury returned an indictment charging Joseph Fisher with eight counts: Count One: Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); Count Two: Assaulting, Resisting or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1); Count Three: Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1); Count Four: Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); Count Five: Engaging in Physical Violence in a Restricted Building or Grounds, in violation of 18 U.S.C.  § 1752(a)(4); Count Six: Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); Count Seven: Act of Physical Violence in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(F); and Count Eight: Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).

On, February 1, 2024, Joseph Fisher pled guilty to the indictment without a plea agreement.

## IV.    STATUTORY PENALTIES

Joseph Fisher now faces sentencing on the above referenced eight counts.

Pages one and two of the Presentence Report identifies the maximum prison terms and fines that apply to each of the conviction.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The draft PSR includes four errors. First, the PSR does not designate Congress as a victim for Count 4 (18 U.S.C. 1752(a)(2)). *See* PSR ¶ 34. Second, the PSR does not group all counts as required under U.S.S.G. §3D1.2 because the counts either involve the same victim or embody conduct that is a specific offense characteristic to another count. *See id.* at ¶¶ 34-37 and 50-53. Third, the PSR does not apply a dangerous weapon specific offense characteristic for Fisher's assault with a chair. *See id.* at ¶ 39. Fourth, the PSR does not apply a cross reference to Civil Disorder for 18 U.S.C. § 1752(a)(1). *See id*. at ¶¶ 44-45.

### a.  Count Four: 18 U.S.C. 1752(a)(2) Congress is the Victim.

The PSR should designate Congress, not law enforcement officers, as the victim for Count 4. *See* PSR ¶ 34. The restricted perimeter was established by the Secret Service to ensure the protection of the members of Congress and Vice President in his role as President of the Senate.

Fisher engaged in disorderly and disruptive conduct within the restricted perimeter with the intent to impede or disrupt the <u>orderly conduct of Government business or official functions</u>. Joint Statement of Offense at 10; *see also United States v. Cyr*, No. 22 Cr.185 (JDB), (D.D.C. 2023), ECF 131 Tr. of Sentencing at 18 (referring to §§ 18 U.S.C. 1752(a)(1) and (2) and noting "Counts 3 and 4 are grouped because they do involve the same victim, which is the broader congressional victim, and there were acts that were connected to some degree, at least by a common objective, a criminal objective, and part of a common scheme.").

    **b. All Counts Group.**

Under U.S.S.G. § 3D1.2, "All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule: (a) When counts involve the same victim and the same act or transaction … [or] (c) When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline appliable to another of the counts."

Initially, Counts One, Two, and Five, charging violations of 18 U.S.C. §§ 231, 111(a) and 1752(a)(4), group because the victims of each count were the police officers who were guarding the Capitol on January 6. *See* U.S.S.G. §3D1.2(a) and (b).

Similarly, Counts Three and Four, charging violations of 18 U.S.C. §§ 1752(a)(1) and 1752(a)(2), group because the victim of each of these counts is Congress. *See* U.S.S.G. §3D1.2(a) and (b).   All the counts then group pursuant to U.S.S.G. § 3D1.2(c) because Count Two embodies conduct that is treated as a specific offense characteristic – namely U.S.S.G. §2A2.2(b)(2)(B), use of a dangerous weapon – to Counts One, Three, Four, and Five.  Therefore, all counts group and

the combined offense level is the highest offense level for the counts in the group. *See* 3D1.3(a).

The highest offense level is 24. *See* Guidelines calculations for paragraphs 38-49 further below.

> **c.   Fisher Used a Dangerous Weapon (Chair) While Assaulting the Capitol Police Officer.**

The PSR does not apply a dangerous weapon specific offense characteristic for its Count

Group 1, which includes Counts One, Two, Four, and Five. *See* Draft PSR ¶ 39. Pursuant to

U.S.S.G. §2A2.2(b)(2)(B), "[i]f a dangerous weapon was used," the offense level is increased by

4 levels. Application Note 1 states that "dangerous weapon" "has the meaning given that term in

U.S.S.G. § 1B1.1, cmt. n.1(E), which is "an instrument capable of inflicting death or serious bodily

injury;" and "includes any instrument that is not ordinarily used as a weapon (e.g., a car, *a chair*,

or an ice pick) if such instrument is involved in the offense with the intent to commit bodily injury,"

U.S.S.G. § 2A2.2., cmt. n.1. (emphasis added).

As Fisher's assault involved the use of a chair with the intent to commit bodily injury, his

conduct falls into the latter category. The government need prove that intent only by a

preponderance of the evidence. *United States v. Leyva*, 916 F.3d 14, 24 (D.C. Cir. 2019). A

"bodily injury" is "any significant injury" – i.e. a painful and obvious injury, or one where medical

attention ordinarily would be sought. *Id.* § 1B1.1 cmt.n.1(B). Fisher rammed a chair into the USCP

officer during a full-blown riot while the officer was running to arrest another rioter. Fisher's intent

was to strike the Capitol Police Officer hard enough with a chair to disrupt the officer's pursuit of

the rioter.   This Court should readily find, by a preponderance, that Fisher intended to cause injury

to the officer given the officer's swift pursuit of the rioter, the hard and multiple joints on the chair,

and Fisher's ramming of the officer with the chair while he was running. *See United States v.*

*Denney,* No. 22-3084, WL 1590375 13 (D.C. Cir. April 12, 2024) *(*holding the dangerous weapon enhancement was applicable as Denney intended to hit the officer's body with a pipe with sufficient force to dislodge the officer's crowd control spray and thereby meant to cause him injury).

### d. Count Three: 1752(a)(1), Fisher Entered and Remained in the Capitol Building with the Intent to Commit a Civil Disorder.

The draft PSR does not apply a cross reference to Civil Disorder for Count Group 2 (Count 3, 18 U.S.C. 1752(a)(1)). *See* PSR ¶¶ 44-45. Pursuant to U.S.S.G. §2B2.3(c)(1): "If the offense was committed with the intent to commit a felony offense, apply §2X1.1 in respect to that felony offense, if the resulting offense level is greater than that determined above."

Here, Fisher entered *and remained* in the restricted area for the purpose of obstructing, impeding, or interfering with a law enforcement officer in the Capitol Building as specified in Count 1 (Civil Disorder). Since there is no applicable Chapter Two Guideline for Count 1 (Civil Disorder) in the Statutory Appendix, "the most analogous guideline" should be used. U.S.S.G. §2X5.1. Here, that is U.S.S.G. §2A2.4, "Obstructing or Impeding Officers." Pursuant to U.S.S.G. § 2A2.4(c), "If the conduct constituted aggravated assault, apply U.S.S.G. § 2A2.2(a) (Aggravated Assault)." As such, the base offense level for 18 U.S.C. 1752(a)(1) after cross referencing should be 14, and the dangerous weapon specific offense characteristic, pursuant to U.S.S.G. §2A2.2(b)(2)(B), should be applied as well. *See* discussion above for Paragraph 39.

e. **Paragraphs 38-49 – Fisher's Offense Level Computation Should be as Follows:**

**Count One: 18 U.S.C. § 231(a)(3) – Obstructing Officers During a Civil Disorder**

Since there is no applicable Chapter Two Guideline for this offense in the Statutory Appendix, use "the most analogous guideline." U.S.S.G. §2X5.1.  Here, that is U.S.S.G. §2A2.4, "Obstructing or Impeding Officers."

| | | |
|---|---|---|
| Base Offense Level | 10 | U.S.S.G. § 2A2.4 |
| Specific Offense Characteristic | +3 | U.S.S.G. § 2A2.4(b)(1): "If (A) the offense involved physical contact … increase by 3 levels." |
| Cross reference | See below | U.S.S.G. § 2A2.4(c): "If the conduct constituted aggravated assault, apply U.S.S.G. § 2A2.2(a) (Aggravated Assault)." |
| Base Offense Level | 14 | U.S.S.G. § 2A2.2(a) Aggravated Assault |
| Specific Offense characteristic: Dangerous Weapon | +4 | Pursuant to U.S.S.G. §2A2.2(b)(2)(B): If a dangerous weapon was used, increase by 4 levels. |
| Chapter 3 Adjustment: Official Victim | +6 | U.S.S.G. § 3A1.2(a), (b): "the victim was a government officer or employee, the offense of conviction was motivated by such status, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person)." |
| Total | 24 | |

**Count Two: 18 U.S.C. § 111(a)(1) —Assaulting, Resisting or Impeding Certain Officers**

The Statutory Index lists two guidelines for a Section 111 offense, U.S.S.G. § 2A2.2 (Aggravated Assault) and U.S.S.G § 2A2.4 (Obstructing or Impeding Officers). The guidelines direct that, if Appendix A lists more than one guideline, use the "most appropriate" guideline for

15

the offense conduct charged in the count of conviction. See §1B1.2 n.1. Here, the most applicable

guideline is § 2A2.4 (Obstructing or Impeding Officers).

| Base Offense Level | 10 | U.S.S.G. § 2A2.4 |
|---|---|---|
| Specific Offense Characteristic | +3 | U.S.S.G. § 2A2.4(b)(1): "If (A) the offense involved physical contact … increase by 3 levels." |
| Cross reference | See below | U.S.S.G. § 2A2.4(c)(1): "If the conduct constituted aggravated assault, apply §2A2.2 (Aggravated Assault)." |
| Base Offense Level | 14 | U.S.S.G. § 2A2.2(a) Aggravated Assault |
| Specific Offense characteristic: Dangerous Weapon | +4 | Pursuant to U.S.S.G. §2A2.2(b)(2)(B) |
| Chapter 3 Adjustment: Official Victim | +6 | U.S.S.G. § 3A1.2(a), (b) |
| Total | 24 | |

**Count Three: 18 U.S.C. § 1752(a)(1) – entering and remaining in a restricted building or grounds**

The Statutory Appendix lists two guidelines for a Section 1752 offense, U.S.S.G. §2A2.4

(Obstructing or Impeding Officers) and §2B2.3 (Trespass). The Guidelines direct that, if Appendix

A specifies more than one guideline, use the "most appropriate" guideline for the offense conduct

charged in the count of conviction. *See* §1B1.2 n.1. Here, the most applicable guideline is § 2B2.3.

| Base Offense Level: | 4 | U.S.S.G. §2B2.3(a) |
|---|---|---|
| Specific offense characteristic | +2 | U.S.S.G. §2B2.3(b)(1)(A)(vii): the trespass occurred "at any restricted building or grounds." On January 6, 2021, the U.S. Capitol was restricted because protectees of the United States Secret Service were visiting. *See* 18 U.S.C. § 1752(c)(1)(B). |

| Cross Reference | | U.S.S.G. §2B2.3(c)(1): "If the offense was committed with the intent to commit a felony offense, apply §2X1.1 in respect to that felony offense, if the resulting offense level is greater than that determined above."<br><br>Fischer entered and remained on restricted Capitol grounds and in the Capitol Building with the intent to obstruct, impede, and interfere with law enforcement officers during a civil disorder, as reflected in Count One, Civil Disorder (18 U.S.C. § 231(a)(3)). Accordingly, pursuant to U.S.S.G. § 2X1.1(a), the Guideline for Count One (U.S.S.G. § 2A2.2) should be used here. |
| Base Offense Level | 14 | U.S.S.G. § 2A2.2(a) Aggravated Assault |
| Specific Offense characteristic: Dangerous Weapon | +4 | Pursuant to U.S.S.G. §2A2.2(b)(2)(B) |
| Total | 18 | |

**Count Four: 18 U.S.C. § 1752(a)(2)—disorderly and disruptive conduct in a restricted building or grounds**

Since there is no applicable Chapter Two Guideline for this offense in the Statutory Appendix, use "the most analogous guideline." U.S.S.G. §2X5.1. Here, that is U.S.S.G. §2A2.4, "Obstructing or Impeding Officers."

| Base Offense Level: | 10 | U.S.S.G. §2A2.4(a) |
| Specific Offense Characteristic: Physical Contact | +3 | U.S.S.G. §2A2.4(b)(1)(A): "If (A) the offense involved physical contact … increase by 3 levels." |
| Cross Reference | See below | Pursuant to § 2A2.4(c), "If the conduct constituted aggravated assault, apply 2A2.2 (Aggravated Assault)." |
| Base offense level | 14 | Pursuant to U.S.S.G. § 2A2.4(c)(1), "[i]f the conduct constituted aggravated assault, apply § 2A2.2 (Aggravated Assault)." |

17

| Specific Offense characteristic: Dangerous Weapon | +4 | Pursuant to U.S.S.G. §2A2.2(b)(2)(B) |
|---|---|---|
| Total | 18 | |

**Count Five: 18 U.S.C. § 1752(a)(4)—engaging in physical violence in a restricted building or grounds**

The Statutory Appendix lists two guidelines for a Section 1752 offense, U.S.S.G. §2A2.4 (Obstructing or Impeding Officers) and §2B2.3 (Trespass). The Guidelines direct that, if Appendix A specifies more than one guideline, use the "most appropriate" guideline for the offense conduct charged in the count of conviction. *See* §1B1.2 n.1. Here, the most applicable guideline is § 2A2.4.

| Base Offense Level: | 10 | U.S.S.G. §2A2.4(a) |
|---|---|---|
| Specific Offense Characteristic | +3 | U.S.S.G. § 2A2.4(b)(1) – If the offense (A) involved physical contact, or (B) a dangerous weapon was possessed and its use threatened, increase by **3** levels. |
| Cross Reference | | U.S.S.G. §2A2.4(c)(1): "If the conduct constituted aggravated assault, apply §2A2.2 (Aggravated Assault)." |
| Base offense level | 14 | Pursuant to U.S.S.G. § 2A2.4(c)(1), "[i]f the conduct constituted aggravated assault, apply § 2A2.2 (Aggravated Assault)." |
| Specific Offense characteristic: Dangerous Weapon | +4 | Pursuant to U.S.S.G. §2A2.2(b)(2)(B) |
| Chapter 3 Adjustment: Official Victim | +6 | U.S.S.G. § 3A1.2(a), (b) |
| Total | 18 | |

*Counts Six through Eight:* The U.S. Sentencing Guidelines do not apply to Class B misdemeanor offenses**.** *See* 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

18

### f. Fisher is Not Entitled to Receive the Benefit of U.S.S.G. § 4C1.1

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria.

Fisher is ineligible for a reduction under U.S.S.G. § 4C1.1. First, Fisher "used violence or credible threats of violence" when he rammed a chair into a USCP officer, then grabbed the officer and pushed him to the ground. U.S.S.G. § 4C1.1(a)(3). Second, Fisher "possess[ed]" (and used) "a dangerous weapon . . . in connection with the offense". U.S.S.G. § 4C1.1(a)(7).[3]

The U.S. Probation Office calculated Fisher's criminal history as category I, which is not disputed. Draft PSR ¶ 61. Accordingly, based on the government's calculation of Fisher's total adjusted offense level, after acceptance of responsibility, at 21, Fisher's Guidelines imprisonment range is 37 to 46 months' imprisonment.

## VI. SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A. Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Fisher's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United

---

[3] To avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.

States into a Constitutional crisis. Fisher entered the Capitol Building, observed the various acts of violence occurring around him, and then engaged in a cowardly assault against a law enforcement officer who was attempting to arrest another violent rioter. The nature and circumstances of Fisher's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 46 months' incarceration.

### B. Fisher's History and Characteristics

Fisher does not have a criminal history and is not, to the government's knowledge, a member of any militias or extremist groups. As a police officer, Fisher took an oath to support the Constitution of the United States. He pledged his loyalty to the country and to uphold its laws. Yet, on January 6, 2021, he participated actively in a violent riot at the United States Capitol, the purpose of which was to disrupt and thwart the peaceful transition of power, a key feature of our constitutional democracy.

As a former police officer, Fisher should have recognized the great risk of serious injury or worse that the officers faced in battling with angry mob that substantially outnumbered them. But, when the time came, Fisher chose violent rioters over his fellow officers – he attacked Officer J.G. and intentionally prevented him from fulfilling his sacred mission – the protection of the U.S. Capitol and its staff.

While Fisher's prior law enforcement service is laudable, it renders his conduct on January 6, and his disregard for the struggling law enforcement officers there, all the more troubling.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Fisher's criminal conduct on January 6 was the epitome of disrespect for the law. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America and that's the peaceful transfer of power.").

### D. The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[4] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

Fisher's sentence should reflect not only that he violated his oath to support the Constitution of the United States but that he chose a violent mob over his fellow officers. As a

---

[4] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

21

former police officer, Fisher himself was trained in recognizing and reacting to a dangerous situation.   Yet when confronted with precisely that, Fisher chose to lie in wait and attack a police officer, rather than helping him apprehend a violent rioter.   Fisher struck Officer J.G. with a chair when the officer was focused on his pursuit of a rioter who had just deployed chemical spray and was unable to see the imminent attack by Fisher. Even after the other rioter had escaped, Fisher grabbed and held on to Officer J.G., thereby allowing another rioter to strike him in the back.

### E.        The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

**F.      Unwarranted Sentencing Disparities**

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision

23

leaves plenty of room for differences in sentences when warranted under the circumstances."
*United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[5]

Although all the other defendants discussed below participated in the Capitol breach on
January 6, 2021, many salient differences explain the differing recommendations and sentences.[6]
While no previously sentenced case contains the same balance of aggravating and mitigating
factors present here, the conduct in the following cases provide suitable comparisons to the
relevant sentencing considerations in this case.

In *United States v. Grady Owens*, 21-cr-286 (BAH), the defendant, like Fisher, violently
attacked a law enforcement officer and pled guilty to violating 18 U.S.C. 111(a). While Owens's
preferred weapon was his skateboard which he used to raise above his head and strike Officer C.B.,
Fisher used a chair to ram into Officer J.G. While Owens's assault was serious, the context
surrounding Fisher's conduct is significantly more abhorrent. Unlike Owens, Fisher entered the
Capitol Building. While inside, Fisher saw a law enforcement officer chasing a rioter. Fisher then
grabbed a chair and waited for the exact moment while the officer was distracted to ram him and
prevent him from apprehending the rioter. Finally, even after assaulting Officer J.G., Fisher also

---

[5] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than
overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP),
Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the
seriousness of [the defendant's] conduct because it does not consider the context of the mob
violence that took place on January 6th of 2021.") (statement of Judge Pan).

[6] A routinely updated table providing additional information about the sentences imposed on other
Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases.
To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL
BREACH CASES." The table shows that imposition of the government's recommended sentence
in this case would not result in an unwarranted sentencing disparity.

grabbed Officer J.G. which allowed another rioter to assault Officer J.G. from behind. Judge Howell sentenced Owens to 37 months incarceration and noted Owens' youth, maturation during the case, and clear regret for his actions. In contrast, Fisher was 49 years old at the time of the assault and, as a police officer, was trained to respond in a calm manner during chaotic situations.

In *United States v. Howard Richardson*, 1:21-cr-721 (CKK), the defendant, like Fisher, violently attacked a law enforcement officer and pled guilty to violating 18 U.S.C. 111(a). Richardson's preferred weapon was a metal flagpole. Richardson's attack was repeated – he struck an officer three times with the flagpole and then helped a group of rioters force a large billboard into the same line of besieged officers. Unlike Richardson, Fisher's assault took place inside the Capitol Building versus on the West Front. Unlike Richardson, Fisher did not participate in a voluntary interview with law enforcement. It is also worth noting the difference in age – Richardson was 72 at the time of the offense versus Fisher being 49 at the time of the offense. Judge Kollar-Kotelly sentenced Richardson to 46 months incarceration.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d

at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). But Fisher was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take

account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[7]

Because Fisher engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold Fisher responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

More specifically, the Court should require Fisher to pay $2,000 in restitution for his convictions on Counts 1 through 8. This amount fairly reflects Fisher's role in the offense and the

---

[7] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   FINE

Fisher's convictions for violations of 18 U.S.C. §§ 111(a) and 231 subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

As of the date of this filing, Fisher has failed to provide the required financial information to the Probation Office in the face of "multiple requests from the Probation Officer." PSR ¶ 89. He has therefore manifestly failed to demonstrate an inability to pay. Pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range here is $15,000 to $150,000. U.S.S.G. § 5E1.2(c)(3).

## IX.  CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 46 months incarceration, three years of supervised release, $2,000 in restitution, and a mandatory $305 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:  **_/s/ Shalin Nohria_**
Shalin Nohria
Assistant United States Attorney
D.C. Bar No. 1644392
United States Attorney's Office
601 D St. NW
Washington, D.C.,
shalin.nohria@usdoj.gov