UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | Criminal No. 23-CR-305-RDM |
| | : | |
| JOSEPH FISHER, | : | |
| | : | |
| Defendant. | : | |

### DEFENDANT'S SENTENCING MEMORANDUM

## I.   Introduction

Joseph Fisher dedicated his life to public service. Now 52 years old, he spent 18 years as a decorated member of the Boston Police Department, retiring only due to the Posttraumatic Stress Disorder he developed as a result of his exposure to repeated traumatic incidents. PSR ¶¶ 77-80, 85. That he would inflict harm on another officer was completely unthinkable to him before the events of January 6, 2021. Yet that is he exactly what he did that day. Recognizing the harm and criminality of his actions, he previously pled guilty to each of the eight counts against him. He is now prepared to come before this Court for sentencing, deeply ashamed but ready to take full responsibility and accept the consequences. See Exhibit A, Letter of Joseph Fisher.

The probation department has correctly calculated the advisory guidelines to recommend a sentence between 24 and 30 months. PSR ¶¶ 94-97.  Yet the advisory guidelines are but one factor for the Court to consider in determining a sentence that is "sufficient, but not greater than necessary." 18

U.S.C. § 3553(a). The Supreme Court has recognized that it "has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007), quoting *Koon v. United States*, 518 U.S. 81, 113 (1996). Joseph Fisher is a disabled, retired law enforcement officer. He is a first-time offender. He has deep family and community support. He has accepted responsibility and expressed sincere remorse. The defense submits that a sentence within the advisory range would be far greater than necessary to achieve the purposes of sentencing for this particular defendant in this particular case. Instead, a sentence of 6 months incarceration, to be followed by two years supervised release with the first six months on home detention, plus the government's requested $2,000 in restitution is one that is "sufficient, but not greater than necessary" to achieve the purposes of sentencing.

## II.   **The probation department has correctly calculated the advisory sentencing range as 24-30 months.**

The government has raised four objections to the probation department's calculation of the offense level in this case. See Government's Sentencing Memorandum at 11-19. The only one which would alter the advisory range is its argument for a four-point enhancement based on the alleged use of a dangerous weapon under USSG 2A2.2(b)(2)(B). However, the probation department is correct in determining that the chair that Mr. Fisher pushed into

an officer who was pursuing a suspect does not qualify as a dangerous weapon because there is no evidence that Mr. Fisher acted "with the intent to commit bodily injury." USSG § 2A2.2(b)(2)(B), Application Note 1; See PSR, p. 25, Probation Officer's Response to Government's Objection to Paragraph 39.

What Joseph Fisher did was wrong and dangerous. He committed an assault and participated in a civil disorder. He recognizes that his actions had the potential to injure the officer. However, under the Sentencing Guidelines' definition, an everyday object like a chair only qualifies as a dangerous weapon when it is used with the "intent" to commit bodily injury. USSG § 2A2.2(b)(2)(B), Application Note 1, referencing definition of "dangerous weapon" at § 1B1.1, Application Note 1(E). The government bears the burden of proving that the enhancement applies by a preponderance of the evidence. Based on the video of the incident, and all of the information before the Court, the government has failed to prove by a preponderance that Mr. Fisher intended to injure the officer.

The video of the assault is very clear about Mr. Fisher's actions and his intent. See Government Exhibit 6. The government is correct in its interpretation of the video that Mr. Fisher was reacting to the aftermath of a physical altercation between officers and suspects out of the camera's view further down the hall. See Government's Sentencing Memorandum at 8. Mr. Fisher takes hold of the chair behind a pillar and waits until a fleeing suspect passes by to slide the chair into the pursuing officer. Government Exhibit 6. Mr. Fisher agrees with the government that he "chose his timing carefully."

3

Government's Sentencing Memorandum at 8. However, both the timing and the manner of the assault show that Mr. Fisher intended to obstruct the officer rather than injure him.

A close viewing of the video shows that Mr. Fisher released the chair as he slid it into the officer. His right hand can be seen swinging back past his body after he releases the chair. A person who intended to injure would have held onto the chair and continued to push forward as it made contact with the officer so as to apply maximum force all the way through contact. Alternatively, a person who intended to injure would have picked the chair up and swung or thrown it at the officer. Certainly Mr. Fisher committed a crime, and a dangerous one at that. However, the purpose of the guidelines is to meaningfully distinguish the severity of different cases. The principle at issue is that either the presence of a dangerous weapon per se or a particular use that turns an everyday object into a dangerous weapon is a meaningful difference that should be punished more severely. Neither of those factors applies to Mr. Fisher's case. The video shows that he acted with the intent to obstruct, and thus the government cannot meet its burden of providing that he acted with the intent to injure. Therefore, the dangerous weapon enhancement does not apply for the reasons stated by the probation department in the Presentence Report, and the advisory guideline range has been correctly calculated as 24-30 months.

The case cited by the government detracts from its conclusion for two reasons. First, in *United States v. Denney*, the defendant explicitly admitted

4

during his plea colloquy that the pipe he struck an officer with was a dangerous weapon. *United States v. Denney*, 98 F. 4th 327, 334 (D.C. Cir. April 12, 2024). Mr. Fisher made no such admission during his plea colloquy. Second, striking an officer with a pipe is simply different from sliding a chair into an officer who was pursuing another suspect. Both are crimes, but they are different under the plain terms of the Sentencing Guidelines.

The government's other three objections relate to whether Congress is the victim of Count Four, the manner in which the counts are grouped, and whether a cross reference should be applied to Count Three to result in a higher offense level. Government's Sentencing Memorandum at 11-18. None of these objections affect the total offense level, but rather the manner in which it was reached. The defense agrees with the probation department's calculation of the offense level for the reasons stated in the Presentence Report.

**III.  <u>The sentencing factors of 18 U.S.C. § 3553(a) demonstrate that a sentence of six months incarceration and six months home detention is sufficient but not greater than necessary in this particular case.</u>**

A. <u>Joseph Fisher's history and characteristics justify a significant downward variance</u>.

The government argues that as a former police officer, Mr. Fisher should have recognized the risk faced by the officers on January 6th, including to the officer he assaulted. See Government's Sentencing Memorandum at 20. Mr. Fisher wholeheartedly agrees. Yet the government seems to suggest that his history as an officer is an aggravating factor that supports its recommendation

of a sentence at the high end of the advisory range. The defense completely disagrees. All of Mr. Fisher's history and characteristics, including his exemplary performance as a Boston police officer and the long-term effects it had on him, are strong support for a downward variance.

Joseph Fisher is 52 years old. He graduated high school and earned a bachelor's degree. PSR ¶ 85. He has no criminal history whatsoever. PSR ¶¶ 59-65. He was employed full-time from ages 25 to 43, at which time he received a disability retirement. PSR ¶ 87. He has been married for 25 years and, together with his wife, has raised two children to adulthood. PSR ¶ 70. Apart from his actions on a single day, Joseph Fisher has been a good man.

Mr. Fisher's education, age, and employment history are all factors which have been shown to be associated with a lower risk of recidivism. His lack of criminal history is also closely associated with a lower risk of recidivism. In 2023 the Sentencing Commission created a two-point offense level reduction for defendants with zero criminal history points because recidivism data showed "that offenders with zero criminal history points have considerably lower recidivism rates than other offenders, including offenders with one criminal history point." U.S. SENT'G COMM'N, AMENDMENTS TO THE SENTENCING GUIDELINES, "Reader-Friendly Version" (April 27, 2023) at 79 (citation omitted), available at

https://www.ussc.gov/guidelines/amendments/adopted-amendments-effective-november-1-2023. The Commission made a policy decision to not apply the reduction to cases involving violence, and the government is correct

that the reduction does not apply to Mr. Fisher. However, Mr. Fisher's low risk of recidivism is not fully captured by his placement in Criminal History Category I, which includes defendants with one criminal history point and those who have convictions which have timed out. Clearly Mr. Fisher should be viewed differently from either of those types of defendants. Although the two-point offense level reduction at § 4C1.1 does not apply to him, his personal history and characteristics show that he is not a risk of reoffending in any way. This generalized, pervasive low risk of recidivism is itself strong support for a downward variance.

Of course Mr. Fisher's experience as a police officer also specifically supports a downward variance – not simply because he was a police officer, but because of the manner in which he conducted himself. Joseph Fisher took his responsibilities to the public very seriously. This is shown clearly in the commendations collected at Defense Exhibit B.

In his 18 years with the Boston Police Department, Joseph Fisher regularly displayed both courage and compassion. In 2000 an offender in a stolen car backed into a fellow officer to avoid apprehension, and then sped directly towards him and another officer, forcing him to fire. Exhibit B. In 2002, he responded to a young woman experiencing a mental health crisis who was attempting to commit suicide by breaking a bottle and ingesting the glass. Despite the presence of a hostile crowd, Mr. Fisher restrained the woman just long enough for her to be placed in an ambulance to be transported for appropriate care. Id.

Mr. Fisher also went above and beyond the already high expectations of his job. In 2011 he was approached by visitors from Montreal who had arrived late at night and were unable to find a place to stay. Upon hearing that they intended to sleep in their car, Officer Fisher instead brought them to the station for food and lodging, a story which was noteworthy enough to be retold in the Boston Globe. Id.

Of course Officer Fisher's most difficult and proud moments came in 2013 in the aftermath of the Boston Marathon bombing. Like so many other officers on the force, he was immediately called into action. As a member of the K-9 unit, he was responsible for searching both the scene of the bombing and also the scene where the suspects were confronted and arrested several days later. In between those events, Officer Fisher and his colleagues barely stopped working. Most residents of the city and surrounding areas were told to shelter-in-place, while Officer Fisher and other first responders ran towards the emergency, rather than away from it. His response was specifically commended by his supervisor. Exhibit B. The city will forever remain in his debt.

Although Joseph Fisher's experiences as a police officer led to many moments worthy of commendation, they also came with a significant cost. He first developed Posttraumatic Stress Disorder after the incident in which he fired at the oncoming vehicle. PSR ¶ 77. He began treatment at the time, including medication. Id. That incident occurred in 2000, but he continued working for the next 15 years, during which time he performed many other acts of public service, all while trying to manage the symptoms of his own trauma.

By the time he responded to the horrific events of the Boston Marathan Bombing in 2013 he had already been suffering from PTSD for approximately 13 years. Within two years aof that event he retired fully due to his condition.

The defense has submitted a letter from Stephanie Samuels, Mr. Fisher's long-time counselor. Exhibit C, Letter of Stephanie Samuels. The two began working together in 2013 after the Marathon Bombing. Id. Ms. Samuels describes how Mr. Fisher suffered regular panic attacks that left him short of breath, sweating, and with heart palpitations. Exhibit C at 2. Having experienced terrible events repeatedly, he dealt with anxiety that something terrible would happen again or that he would lose control. Id. Mr. Fisher has also reported that his emotional struggles included suicidal ideation, thoughts which also resurfaced following his arrest in this case but which have fortunately receded. PSR ¶ 80. Through counseling, Ms. Samuels helped Mr. Fisher learn to identify triggers and develop coping strategies. Id. Their work also eventually gave him a safe place to disclose unrelated childhood trauma, an event he had previously only told his wife. Id; See PSR ¶ 68.

In her work with Mr. Fisher, Ms. Samuels also identified another contributing factor to his mental health struggles. She learned that he has experienced a series of head injuries throughout his life, most of which were not identified as head injuries at the time. Exhibit C, Letter of Stephanie Samuels at 3. These include his time boxing both as a child and at the police academy, being struck in the head with a tire in high school, multiple car accidents and multiple falls. Id. He also has been exposed to repetitive impacts

through playing football and hockey and firing guns as part of his job. Id.

Based on her experience, Ms. Samuels believes that Mr. Fisher likely suffers from frontal lobe damage that contributes to his emotional struggles, including poor impulse control. Id. In response, Mr. Fisher recently completed brain imaging and submitted it to the Cantu Concussion Center in Concord, Massachusetts. Id; See "Cantu Concussion Center" available at:

https://www.emersonhospital.org/locations/concussion-center. The goal is for Mr. Fisher to better understand his particular condition and obtain the most appropriate treatment.

Joseph Fisher's symptoms of PTSD- specifically generalized, recurrent anxiety and poor impulse control- clearly played a role in his offense. For more than twenty years prior to January 6, 2021 he struggled with panic attacks and a consistent fear that his life was becoming out of control. Exhibit C, letter of Stephanie Samuels at 2; PSR ¶¶ 77-80. The presentence report writer spoke with Mr. Fisher's wife Debra, who reported a more distinct change in his demeanor after he fell from a ladder in 2015. PSR ¶¶ 75, 81. She stated that he became obsessed with a series of different activities, including doomsday prepping. PSR ¶ 81. Because his mobility was limited due to a serious foot injury caused by the fall, he spent most of his time in the house watching the news all day long and becoming obsessed with politics. Id. This was in 2015, the same year Donald Trump announced his candidacy for the presidency.

In hindsight, Joseph Fisher was particularly susceptible to the misinformation that was widely disseminated after the 2020 presidential

election. He was a person who cared very much about his community and his country, so much so that he chose a life in public service as a police officer. He earned numerous commendations for his commitment to the job, yet the trauma he repeatedly experienced left him suffering from Posttraumatic Stress Disorder. He also had a history of undiagnosed head injuries. Both of these conditions appear to have contributed to his persistent, generalized anxiety and poor impulse control. When he fell off a ladder in 2015, the obvious injury was the one to his foot that left him unable to move easily for an extended period, but the undiagnosed injury, based on the dramatic change in his behavior, may very well have been a concussion. Starting with a love of country, fed a steady diet of misinformation, and suffering from serious anxiety and poor impulse control, Joseph Fisher traveled to the District to attend then-President Trump's "Stop the Steal" rally on January 6, 2012. Government's Sentencing Memorandum at 3. He is responsible for the crimes he committed that day, but the particular confluence of factors that led him there warrant a downward variance.

B. <u>The nature and circumstances of the offense show that while Mr. Fisher's conduct was serious, the assault was brief and he immediately experienced regret</u>.

Mr. Fisher differs from many January 6th defendants in several ways. There is no evidence whatsoever that he went to the Capitol anticipating violence. He did not bring a weapon nor protective gear of any kind. There is no evidence he made any social media statements either before or afterwards that advocated

either violence or interference with the the government. All the evidence before the Court shows that Joseph Fisher committed his offenses without planning and in a relatively short period of time.

Joseph Fisher entered the Capitol building at 2:24 p.m. Government's Sentencing Memorandum at 3. He committed the assault on the officer at 2:39 p.m., approximately 15 minutes later. Government's Sentencing Memorandum at 8. During those 15 minutes, he was in the area when others threatened and assaulted officers, but he neither approached officers nor damaged any property. If either had been his intent, he certainly had ample opportunity to do so. From the time he committed the assault at 2:39 p.m., it took only three minutes for him to leave the building at 2:42 p.m. Government's Sentencing Memorandum at 9.

The government misreads the video which shows Mr. Fisher sitting and smoking outside the Capitol doors at its Exhibit 1. The government argues that he calmly paused to smoke a cigarette before entering. It labeled the video "Fisher enjoys smoke as Capitol Breach occurs."  The problem is that this video shows Mr. Fisher after he exited the Capitol, not before he entered.

Government's Exhibit 2 is the video which shows Mr. Fisher before he entered. In this video he is wearing the same black, winter hat he wore at the rally beforehand. See Government's Sentencing Memorandum at 3, Image 1. In all the videos that show him inside the Capitol, he is not wearing the hat. Similarly, the sitting/smoking video at Exhibit 1 also shows him without the hat. In addition, the crowd is significantly different between the two videos at

Exhibit 1 and Exhibit 2. Exhibit 2 shows a larger crowd which is entering the building. Exhibit 1 shows a smaller, different crowd with several people exiting. Mr. Fisher recalls this moment. It was within three minutes of him assaulting the officer. Recognizing the seriousness of what he had done, he immediately left the building and sat down. While he admittedly appeared energized in Government's Exhibit 2, which shows him prior to his entry, he is disheveled and worn out in Government's Exhibit 1, which shows him after his exit. He clearly did not "enjoy" his experience inside. At that moment he was struggling to appreciate the severity of what he had done. That appreciation obviously came too late. Yet the appreciation immediately after an unplanned assault is consistent with the anxiety and poor impulse control that he suffers as a result of PTSD and head injuries. Those conditions are not excuses and Mr. Fisher acknowledges there are consequences to his behavior. The defense simply offers that the nature and circumstances of the offense are consistent with the history and characteristics of Mr. Fisher such that both factors support the requested downward variance.

    C. <u>A sentence of six months incarceration and six months home detention would be consistent with similar cases and would avoid unwarranted sentencing disparity.</u>

Every case is unique, but a comparison to similarly situated defendants is an important consideration in accordance with the statutory requirement to avoid unwarranted sentence disparities. 18 U.S.C. § 3553(a)(6). Several cases

support the defense's recommendation of six months incarceration and six months home detention as a condition of two years supervised release.

In *United States v. Bruno Cua*, 21-CR-107, this Court found the guidelines to be 27-36 months, greater than the 24-30 months that should apply to Mr. Fisher. The Court sentenced Mr. Cua to 12 months and a day. Considering that Mr. Cua would be entitled to earn 54 days in reductions for good behavior on such a sentence, the actual sentence will likely be closer to 10 months, during which time he will also be eligible for halfway house placement from the Bureau of Prisons. Should this Court sentence to Mr. Fisher to six months incarceration as requested, he would not be eligible for good time reductions and instead would be required to serve the entire six months. The defense submits that the comparison to *Cua* is appropriate and that Mr. Fisher should receive a shorter sentence both based on the advisory guidelines and the other factors of 18 U.S.C. § 3553(a).

Another comparable case is that of *United States v. Michael Lockwood*, 23-CR-146. In *Lockwood*, the guidelines appear to have been 24-30 months and the Court imposed a sentence of a year and a day. In contrast to Mr. Fisher, Mr. Lockwood forcefully took a baton from a police officer and bragged about getting a "souvenir." *Lockwood*, supra, Dkt. 36, Government's Sentencing Memorandum at 2. Mr. Lockwood also did not present with as distinguished a career as Mr. Fisher nor a relevant mental illness as mitigation. In comparison, the defense believes that Mr. Fisher's sentence should be shorter than Mr. Lockwood's.  Again, the difference in actual incarceration

14

between six months and 12 months and a day is closer to four months than six months due to the unavailability of good time reductions for sentences one year or shorter.

A third comparison to Mr. Fisher's case can be found at *United States v. Mark Leffingwell*, 21-cr-005-ABJ. Mr. Leffingwell pled guilty to Assaulting, Resisting, or Impeding a Federal Officer under 18 U.S.C. § 111(a)(1) pursuant to a plea agreement. *Leffingwell*, at Dkt. 25. The parties in *Leffingwell* agreed that the defendant faced the same advisory range as should apply to Mr. Fisher- 24 to 30 months. Id at 3. As described in the government's sentencing memorandum in that case, Leffingwell entered the Capitol building and found himself face to face with a regrouped line of officers. *Leffingwell*, Dkt. 31 at 7. Leffingwell then chanted at the officers. Id at 8. When the officers pressed on the crowd to back them out of the doors, Leffingwell punched one officer in the head, then punched another officer in the head, and the punched the first officer again. Id.

Judge Berman Jackson sentenced Leffingwell to the sentence requested by the defendant here- six months incarceration and two years supervised release, without the six months home detention recommended by Mr. Fisher. *Leffingwell*, Dkt. 51. Mr. Fisher should receive no more than Leffingwell because his conduct was less repetitive and he presents greater evidence of mitigation.

15

D. Joseph Fisher's expressions of true remorse, including to his supportive family, support a downward variance because important sentencing factors like specific deterrence and further protection of the public do not require incarceration.

In contrast to many January 6th defendants, Joseph Fisher has expressed true regret and remorse. See Exhibit A, Letter of Joseph Fisher. He has written of the "shame and embarrassment for the harm [he] caused that day." Id. He offers no minimizations or excuses based on political beliefs or the fact that Capitol officers appropriately used sprays and riot gear as defensive measures. Joseph Fishers knows that he was completely in the wrong, full stop.

Mr. Fisher has not only expressed that belief to the Court as part of this sentencing, but to his many friends and family as well. The defense has submitted letters of support for Mr. Fisher in two exhibits, one comprising letter from family and the other letters from friends. See Exhibit D, Letters of Support- Family, and Exhibit E, Letters of Support – Friends. Most of them address the difficult conversations they have had with Mr. Fisher about his behavior. One example is the letter from his son, Joseph. Exhibit D, Letter of Joseph Fisher. His son writes that upon seeing his father after his release from arrest in this case, his father's only response was to hug him and apologize for the harm he had caused, not expecting any forgiveness. Id.

Because Joseph Fisher understands and can articulate the harm he caused, it is not necessary to incarcerate him as specific deterrence. All the evidence in this case, including his personal history and characteristics, shows

that he presents no risk of recidivism whatsoever. The defense acknowledges that despite the great achievements of his life, the severity of his conduct in this case warrants a period of incarceration as "just punishment." 18 U.S.C. § 3553(a)(2)(A). The defense submits that six months of incarceration, combined with six additional months of home detention, two years of supervised release, and $2,000 restitution is sufficient in light of all the facts of this case.

Incarceration will carry a particular sting for Joseph Fisher. He is 52 years old.  He has never even accused of a crime before, let alone been incarcerated. This will thus be the first period of forced separation from his family in his entire life. He suffers from medical and emotional conditions which will also make incarceration more difficult. He will be subject to increased risk as an incarcerated law enforcement officer. The particular experience of his incarceration will ensure that adequate punishment is achieved by a six-month sentence.

Once Mr. Fisher is released from whatever sentence this Court imposes, he will benefit from the extensive family and community support shown in the letters submitted on his behalf. Because the people closest to him now understand his particular vulnerabilities in this day and age, they will be better prepared to help him manage symptoms and ensure that he receives the necessary mental health, medical, and substance abuse treatment. Mr. Fisher wants to make amends for his conduct. The information before the Court shows that he will be able to do so by returning to his prior life as a loving, positive member of his community.

## V. __Conclusion__

Joseph Fisher has clearly acknowledged the harm he caused, both to the Court and to his family. He has accepted responsibility by pleading guilty and by being honest with his loved ones about his conduct. Where the correct advisory range recommends a sentence of 24 to 30 months, a sentence of six months incarceration and two years of supervised release with the first six months in home detention, plus $2,000 in restitution, is fully supported by the sentencing factors of 18 U.S.C. § 3553(a), specifically the nature and circumstances of the offense, the history and characteristics of the defendant, and the need to avoid unwarranted sentence disparities.

Respectfully Submitted,
JOSEPH FISHER
By his attorney,

_/s/ Joshua R. Hanye_
Joshua R. Hanye
MA B.B.O. No. 661686
Joshua_Hanye@fd.org
Federal Defender Office
51 Sleeper Street
Boston, MA  02210
Tel: 617-223-8061

### Certificate of Service

I hereby certify that this document was sent electronically to those registered through ECF on May 20, 2024.

_/s/ Joshua R. Hanye_
Joshua R. Hanye

18